# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Children's Service Center,     :
    :
           Appellant     :
    :
           v.     :     No. 1672 C.D. 2014
    :
City of Wilkes-Barre Zoning     :     Argued: September 17, 2015
Hearing Board     :


BEFORE:     HONORABLE DAN PELLEGRINI, President Judge[1]
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge


OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE COHN JUBELIRER**            **FILED: February 18, 2016**

Children's Service Center (CSC) appeals from the Order of the Court of Common Pleas of Luzerne County (trial court) that denied CSC's appeal from the Decision of the City of Wilkes-Barre (City) Zoning Hearing Board (Board). The Board denied CSC's application (Application) for a special exception to operate a group home in a R-1 zoning district under the City's Zoning Ordinance (Ordinance). On appeal, CSC argues that the Board abused its discretion in denying the Application because its findings that CSC did not meet the Ordinance's criteria for a special exception are not supported by substantial

---

[1] This case was assigned to the opinion writer on or before December 31, 2015, when President Judge Pellegrini assumed the status of senior judge.

evidence. Discerning no abuse of discretion in the Board's denial of the Application, we affirm.

CSC, a non-profit corporation, filed the Application to operate an eight-person co-ed group home in the City at 25 and 35 Old River Road (together, Property) for children between the ages of thirteen and twenty-one. CSC intends to relocate its similar group home from Nanticoke, where it has been located for twenty-six years, to the Property. CSC entered into two agreements of sale to purchase the Property from The Diocese of Scranton, contingent upon receiving approval of its Application. The Property consists of the former rectory of St. Theresa's School and Church (St. Theresa), which is a single family residence, and a vacant lot with parking where St. Theresa's formerly stood.

Group homes are permitted by special exception in R-1 zoning districts. Section 604 of the Ordinance provides the general standards used in reviewing applications and plans for special exceptions in the City. Relevant here are the additional standards for special exceptions set forth in Sections 702.23 and 1410.2 of the Ordinance.[2] Section 702.23 of the Ordinance addresses group residences and, in relevant part, provides that "[a] Group Residence shall be operated and maintained in the character of a residential dwelling in harmony with and appropriate in appearance with the character of the general vicinity in which it is to be located." (Ordinance § 702.23(E).) Section 1410.2 of the Ordinance sets forth nine requirements for obtaining a special exception, three of which are at issue here. Those provisions are as follows:

---

[2] These Ordinance provisions are found at pages 140a-143a of the reproduced record.

2

The Board shall grant approval only upon the determination that the proposed use and/or development conforms with all applicable standards and provisions within this Ordinance and the following expressed standards and criteria:

. . . .

5. The proposed use shall be compatible with adjoining development and the character of the zoning district and neighborhood in which it is proposed to be located. The nature and intensity of the operation of the proposed use shall be considered regarding its compatibility or lack thereof.

6. The proposed use shall not substantially impair the value of other property in the neighborhood where it is proposed to be located.

. . . .

9. The proposed use and/or development shall not be injurious to the public interest.

(Ordinance § 1410.2(5), (6), and (9).) The Ordinance specifically requires that the special exception "shall [not] adversely affect the health, safety and welfare of the public and/or the environment." (Ordinance § 604(A).)

At the hearing on the Application before the Board, CSC presented the testimony of its Chief Executive Officer (CEO),[3] its Director of Residential Services (Director),[4] and certified real estate appraiser Joseph J. Mantione, who

---

[3] The CEO's testimony from the Board hearing is found at pages 32a-61a of the reproduced record.

[4] The Director's testimony from the Board hearing is found at pages 76a-89a of the reproduced record.

was accepted as an expert.[5]   In addition, CSC offered documentary evidence regarding its licensing,[6] the type of group homes and services it provides, the type of children served by the group homes, and the number of police contacts associated with CSC's current group homes.   The report of police contacts indicated that, in the twelve months before the hearing, the police were contacted fifty-three times by CSC's two existing group homes, including one located approximately .4 miles from the Property.  (Ex. 4; Hr'g Tr. at 33, R.R. at 47a.)

The CEO described CSC's mission, the services it provides to children, its proposed group home for eight children between the ages of 13 and 21 on the Property, and the programs associated with the group home.  He explained that CSC wanted to move the Nanticoke group home to the Property because it is handicap accessible and there are better education and job opportunities in the City

---

[5] Mr. Mantione's testimony from the Board hearing is found at pages 62a-75a of the reproduced record.

[6] Section 702.23(B) and (C) of the Ordinance require that:

> B. The Group Residence shall be under the jurisdictional and regulatory control of a governmental entity (County, State, and/or Federal).

> C. The applicant and/or operator of a Group Residence shall provide written documentation from the applicable government entity which certifies said Group Residence complies with the location, supervised services, operation, staffing and management of all applicable standards and regulations of the subject governing program.

(Ordinance § 702(B), (C).)  CSC presented, *inter alia*, its license for its Nanticoke group home from the then-Department of Public Welfare (Department), and the "Service Descriptor for the Sanctuary model CRR Home" submitted to the state as evidence that its proposed group home would meet these requirements.  (Exs. 1, 3; Hr'g Tr. at 30-31, R.R. at 44a-45a.)

4

than in Nanticoke. According to the CEO, most of the children attend public school, the average length of stay is 230 days, and the children would be involved in volunteering in the community. He stated that, in preparation for the hearing, CSC had obtained a report of police calls over the past year from its other facilities, and he explained that most of the calls were related to children missing curfew or not being at school.

The Director testified in more detail about the programs that would be offered at the group home, including structured activities, learning independent living skills, recreational activities, and individual, group, and family therapy. She explained the process of accepting children into the group home, indicating that the child had to agree to live in the group home and a child who is too unstable or unsafe is not accepted. The Director described the daily activities of the group home, which include the children going to school, and the group home's rules, which prohibit cursing and violence, and impose a 9:00 p.m. curfew.

Mr. Mantione testified about his qualifications and opined that the approval of the group home at the Property would have "little to no effect on the . . . marketability of the residential properties in the area." (Hr'g Tr. at 53, R.R. at 67a.) Mr. Mantione described the manner in which he arrived at his conclusion, noting that he reviewed all of the residential properties in the City to come to an average price for a residence in the City and then reviewed the impact that CSC's other group home, located .4 miles away from the Property, had on the surrounding residential properties. Upon further questioning, Mr. Mantione acknowledged that: the median sales price in the City varied greatly depending on location; the neighborhood in which the Property is located, South Wilkes-Barre, is different

from other areas in the City; South Wilkes-Barre's real estate market "stands alone" and has substantially different valuations than other areas of the City; the two group homes would be substantially different; and he was unaware that the other CSC group home he used to analyze the impact of the proposed group home was located in a R-3 district, not a R-1 district. (Hr'g Tr. at 53-61, R.R. at 67a-75a.)

Several individuals testified[7] in support of CSC's Application, including an attorney who lives and works across the street from one of CSC's current group homes. However, many neighborhood residents testified in opposition to the proposed group home (Objectors).[8] Objectors cited concerns including: the change in the character of the single-family neighborhood that would result from approving a group home; the transient nature of the group home where the children are just passing through the neighborhood and are not going to be a part of the community; and the increase in school buses in the area. One resident noted that between January 1, 2014 and the date of the hearing, April 23, 2014, twenty-seven police calls were made in association with the nearby CSC-operated group home. He further pointed out that Mr. Mantione's conclusion that the marketability of the neighborhood's homes would not be impacted by the approval of the group home was based on a formula that involved "a completely different campus and a completely different section of" the City. (Hr'g Tr. at 113-14, R.R. at 127a-28a.)

---

[7] This testimony from the Board hearing is found at pages 90a-98a of the reproduced record.

[8] Objectors' testimony from the Board hearing is found at pages 101a-29a of the reproduced record.

The Board's solicitor noted that, under the Ordinance, the City's Planning Commission had considered the Application and did not recommend its approval.

At the end of the hearing, the Board voted unanimously to deny CSC's Application. The Board issued its adjudication with its findings of fact and conclusions of law. The Board found that the Property is zoned R-1, Residential – Single Family, and is located in the highest value R-1 district in the City, the largest contiguous R-1 district in the City, and the only R-1 district in South Wilkes-Barre. The R-1 district is "intended to create, preserve and enhance areas composed primarily of single-family residences built at relatively lower densities." (FOF ¶ 8.) The Board further found:

10. The "Service Descriptor for the Sanctuary/Model CRR Home" [(Service Descriptor)] submitted by the Applicant to the State of Pennsylvania describes the target population as "adolescents between the ages of 12-17 years old[] . . . who manifest emotional, social, and/or behavioral patterns that are a function of mental illness and/or traumatic events within their lives. . . . [T]he youth's treatment needs are considered to be intensive and specialized to psychiatric and/or trauma specific interventions which forms the basis of the referral."

11. The "Service Descriptor . . ." submitted by the Applicant to the State of Pennsylvania describes: "The overall goal of the CRR Group Home is to provide community based therapeutic care for 10 seriously disturbed and/or emotionally injured youth, some of whom may also be dependent and/or neglected, who might otherwise require more restrictive settings."

12. The "Service Descriptor . . ." submitted by the Applicant to the State of Pennsylvania states: "The average length of stay will range from 6 months to one year."
. . . .

7

15. Applicant's Exhibit 4 is a report of police contacts from April, 2013 to April[,] 2014 of CRR police contacts at the Nanticoke Group Home and the Franklin Street, Wilkes-Barre Group Home which represents the type of police involvement with the type of group home facility Applicant is applying for on [t]he [Property] except that the age groups involved at these homes is 12 to 18 years old.

. . . .

18. The statistical analysis report and letter prepared by Joseph J. Mantione, Certified Residential Real Estate Appraiser, stating that establishment of a group home at [t]he [Property] would have no negative effect on the surrounding area and no effect on the marketability of surrounding properties is not credible and the conclusions noted therein are rejected by the Board due to the statistical analysis not being limited to the South Wilkes-Barre area, but including the entire City of Wilkes-Barre, the fact that Mr. Mantione did not know and did not take into account the R-1 Zoning District classification, and the unique characteristics of the relevant R-1 zone and neighborhood surrounding [t]he [Property]. *April 23, 2014 Hearing Transcript, p. 51, lines 1 through p. 57, line 12.*

. . . .

20. The character of the neighborhood surrounding [t]he [Property] and the public interest in maintaining the R-1 Zoning District characteristics would be adversely effected by the use of [t]he [Property] for the Group Home proposed by the Applicant due to the mix of ages (12 to 21) who would be residing in the Group Home, the types and number of police calls associated with the Nanticoke and Franklin Street group homes, and the presence of a higher treatment level group home within .4 miles of [t]he [Property]. *April 23, 2014 Hearing Transcript, p. 51 lines 1 through p. 87, line 16 th[r]ough p. 114.*

21. The values of nearby single-family homes would be adversely impacted by the use of [t]he [Property] for the Group Home proposed by the Applicant due to the mix of ages (12 to 21) who would be residing in the Group Home, the types and number of police calls associated with the Nanticoke and Franklin Street group homes, and the presence of a higher treatment level group home within .4 miles of [t]he [Property]. *April 23, 2014 Hearing Transcript, p. 51 lines 1 through p. 87, line 16 th[r]ough p. 114.*

8

22. The use of [t]he [Property] for the Group Home and associated uses proposed by the Applicant is not compatible with the character of R-1 Single Family Residence Zoning District. *April 23, 2014 Hearing Transcript, p. 51 lines 1 through p. 87, line 16 th[r]ough p. 114.*

(FOF ¶¶ 10-12, 15, 18, 20-22 (emphasis in original).) The Board concluded that CSC failed to meet the requirements of Sections 702.23(E) and 1410.2(5), (6), and (9) of the Ordinance and, therefore, denied the Application. CSC appealed to the trial court, which affirmed without taking additional evidence. CSC now appeals to this Court.[9]

CSC asserts on appeal that the Board's findings that CSC did not meet the Ordinance's criteria for obtaining a special exception are not supported by substantial evidence. According to CSC, the record evidence shows that the proposed group home has all of the characteristics of a natural family unit – the children attend school, participate in after school programs and community service activities, do chores, have curfews and rules with which they must abide, and are integrated into the community. CSC relies on Mr. Mantione's expert opinion that there would be little to no effect on the marketability of the residential properties in the area by granting the special exception, which Objectors did not rebut with any evidence beyond their own lay testimony. CSC argues that this is the classic case

---

[9] "Where, as here, the trial court has not taken any additional evidence, this Court's scope of review is limited to a determination of whether the zoning hearing board committed an error of law or abused its discretion." Smith v. Zoning Hearing Board of Huntingdon Borough, 734 A.2d 55, 57 n.2 (Pa. Cmwlth. 1999). An abuse of discretion occurs only if the Board's findings are not supported by substantial evidence, which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id.

9

of the Board relying on Objectors' generalized fears of the impact of the proposed group home; however, such fears alone are insufficient to establish that the special exception would be contrary to the public interest. Berlant v. Zoning Hearing Board of Lower Merion, 279 A.2d 400, 402 (Pa. Cmwlth. 1971).

"A special exception is not an exception," but is "a use which is expressly permitted, absent a showing of a detrimental effect on the community." Manor Healthcare Corporation v. Lower Moreland Township Zoning Hearing Board, 590 A.2d 65, 70 (Pa. Cmwlth. 1991). This Court has described the relevant burdens of proof in special exception cases as follows:

> [t]he applicant for the proposed use has both the duty to present evidence and the burden of persuading the Board that the proposed use satisfies the objective requirements of the ordinance for the grant of a special exception. Once the applicant meets these burdens, a presumption arises that the use is consistent with the health, safety and general welfare of the community. The burden then normally shifts to the objectors of the application to present evidence and persuade the Board that the proposed use will have a generally detrimental effect. Where, . . . however, the zoning ordinance specifically places the burden on the applicant to show that the proposed use will not have a detrimental effect, the applicant only retains the burden of persuasion. Objectors still retain the initial presentation burden with respect to the general matter of the detriment to health, safety and general welfare. . . . The evidence presented by objectors must show a high probability that the use will generate adverse impacts not normally generated by this type of use, and that these impacts will pose a substantial threat to the health and safety of the community. . . .

Freedom Healthcare Services, Inc. v. Zoning Hearing Board of City of New Castle, 983 A.2d 1286, 1291 (Pa. Cmwlth. 2009) (citations omitted).

10

In <u>Bray v. Zoning Board of Adjustment</u>, 410 A.2d 909 (Pa. Cmwlth. 1980), we observed that there is a distinction between the burden of production of evidence and the burden of persuasion in special exception cases. We explained that, while the burden of production may shift if an applicant presents evidence that it satisfies the specific requirements of the zoning ordinance, the burden of persuasion remains with the applicant when the "zoning ordinance . . . place[s] the burden of proof upon the applicant as to the matter of detriment to health, safety and general welfare." <u>Id.</u> at 912 (internal quotation marks omitted). Thus, if objectors

> raise specific issues concerning health, safety and general welfare, then the burden would continue to be with the applicant. The applicant would be required to come forward to meet the objections so as to show that the intended use would not violate the health, safety and general welfare of the community with relation to such objections. It would then be the duty of the [b]oard in the exercise of its discretionary power to determine whether or not the applicant had met its burden of proof.

<u>Id.</u> (quoting <u>Butler v. Derr Flooring Company, Inc.</u>, 285 A.2d 538, 542 (Pa. Cmwlth. 1971)).

Here, the Ordinance places specific requirements on applicants for special exceptions, found in Sections 702.23 and 1410.2, and CSC was required to present evidence that it satisfied those requirements. CSC had to establish, *inter alia*, that the group home would: (1) "not substantially impair the value of other property in the neighborhood"; (2) operate "and [be] maintained in the character of a residential dwelling in harmony with . . . the character of the general vicinity in which it is to be located"; (3) "be compatible[, including in its nature and intensity,] with . . . the character of the zoning district and neighborhood"; *and* (4)

11

"not be injurious to the public interest." (Ordinance §§ 702.23(E), 1410.2(5), (6), (9).) An applicant must meet *all* of the requirements set forth in the Ordinance before the Board may grant a special exception. (Ordinance § 1410.2.) If CSC met its burden on these issues, the burden would shift to Objectors regarding whether the proposed use would be a detriment to the health, safety, and general welfare of the community. Freedom Healthcare Services, 983 A.2d at 1291. If Objectors satisfy their burden, CSC must then persuade the Board that its proposed use would not be a detriment to the health, safety, and general welfare of the community because the Ordinance places the ultimate burden on this issue on the applicant. Bray, 410 A.2d at 912.

One of the requirements for CSC to establish was that the proposed group home would "not substantially impair the value of other property in the neighborhood." (Ordinance § 1410.2(6).) CSC attempted to do so by presenting Mr. Mantione's report and opinion that the group home would have no negative effect on the marketability of the surrounding properties. However, the Board rejected, as not credible, CSC's only evidence on this point. The Board provided specific reasons for rejecting that testimony. It found that Mr. Mantione's methodology, which relied upon the values of homes throughout the City of Wilkes-Barre, rather than on South Wilkes-Barre alone, and did not consider the Property's location in a R-1 Zoning District or the unique characteristics of this particular R-1 Zoning District and neighborhood. (FOF ¶ 18.) These reasons are supported by the record. Although CSC asserts, essentially, that the Board had to credit Mr. Mantione's opinion and report because Objectors did not present specific rebuttal evidence, the Board, as the fact finder in zoning matters, "is the

12

sole judge of the credibility of witnesses and the weight to be given their testimony . . . and [it] is free to reject even uncontradicted testimony it finds lacking in credibility." Abbey v. Zoning Hearing Board of Borough of East Stroudsburg, 559 A.2d 107, 111 (Pa. Cmwlth. 1989) (citations omitted). Moreover, the burden shifting discussed in Freedom Healthcare Services and Bray, and asserted by CSC here, address issues related to the impact of a proposed special exception on the health, safety, and general welfare of the community, not the other requirements of an ordinance an applicant must initially establish before the burden of production shifts to the objectors. Freedom Healthcare Services, 983 A.2d at 1291; Bray, 410 A.2d at 912. Because CSC did not prove that its proposed use satisfied this requirement, CSC did not establish its entitlement to a special exception under the Ordinance.[10] (Ordinance § 1410.2); Freedom Healthcare Services, 983 A.2d at 1291.

Accordingly, we affirm.

_____
**RENÉE COHN JUBELIRER, Judge**

---

[10] Because CSC was required to satisfy all of the requirements set forth in the Ordinance and it did not do so, we will not address CSC's challenges to the Board's other findings.

13

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Children's Service Center, | : | |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 1672 C.D. 2014 |
| | : | |
| City of Wilkes-Barre Zoning | : | |
| Hearing Board | : | |

## O R D E R

**NOW**, February 18, 2016, the Order of the Court of Common Pleas of Luzerne County, entered in the above-captioned matter, is hereby **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER, Judge**

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Children's Service Center,                    :
                          Appellant     :
                                        :
          v.                            :  No. 1672 C.D. 2014
                                        :  Argued:  September 17, 2015
City of Wilkes-Barre Zoning             :
Hearing Board                           :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
           HONORABLE RENÉE COHN JUBELIRER, Judge
           HONORABLE P. KEVIN BROBSON, Judge


OPINION NOT REPORTED


DISSENTING OPINION BY
PRESIDENT JUDGE PELLEGRINI                  FILED: February 18, 2016


          The majority affirms the denial of a special exception for the Children's

Service Center (CSC) to operate a group home on the basis that it did not meet the

Ordinance's criteria for a special exception because it did not establish that the use

would (1) "not substantially impair the value of other property in the neighborhood";

(2) operate "and [be] maintained in the character of a residential dwelling in harmony

with … the character of the general vicinity in which it is to be located"; (3) "be

compatible[, including in its nature and intensity,] with … the character of the zoning

district and neighborhood"; and (4) "not be injurious to the public interest."

(Ordinance §§702.23(E), 1410.2(5), (6), (9).)  I disagree with the majority because

the burden never shifted to the CSC to establish those factors as Objectors never

established that the adverse effects of the group home's use were not those normally associated with that type of use.

As the majority points out, a special exception is not an exception to the zoning ordinance, but a use that is expressly permitted unless there is a showing that the special exception applied for has a detrimental effect on the community. The detrimental effect proffered cannot be that the special exception applied for itself would cause an adverse effect, but that some facet of the use would cause more than the effects normally associated with such a use. Otherwise, the special exception itself would be illusory.

The question then becomes who has the burden when the Ordinance provides that the burden is on the applicant that the use will not be detrimental to the community. We answered that question in *Freedom Healthcare Services, Inc. v. Zoning Hearing Board of City of New Castle*, 983 A.2d 1286, 1291 (Pa. Cmwlth. 2009) where we stated:

> Where … the zoning ordinance specifically places the burden on the applicant to show that the proposed use will not have a detrimental effect, the applicant only retains the burden of persuasion. Objectors still retain the initial presentation burden with respect to the general matter of the detriment to health, safety and general welfare. The evidence presented by objectors must show a high probability that the use will generate adverse impacts not normally generated by this type of use, and that these impacts will pose a substantial threat to the health and safety of the community. (Citation omitted).

DRP - 2

In this case, Objectors never satisfied the initial presentation burden that showed a "high probability" that any effect from this particular group home would not be of a type that is "normally generated by this type of use" so the burden never shifted to the CSC to establish that it met those criteria. As a result, just because the CSC real estate witness was found to be not credible regarding whether the permitted group home use would not have an adverse effect on the community or real estate prices is irrelevant because the burden never shifted to the CSC to establish that it would not.

Accordingly, I respectfully dissent.

_____
DAN PELLEGRINI, President Judge